Filed 7/28/26  In re R.L. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re R.L., a Person Coming Under the Juvenile Court Law. | B349883 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>KAREN L.,<br><br>        Defendant and Appellant. | (Los Angeles County Super. Ct. No. 19CCJP02354) |

        APPEAL from an order of the Superior Court of Los Angeles County, Georgia A. Huerta, Judge.  Affirmed.

        Richard Knight, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Jacklyn K. Louie, Assistant County Counsel, and Sarah Vesecky, Principal Deputy County Counsel for Plaintiff and Respondent.

———————————

Karen L. (mother) appeals from a juvenile court order terminating parental rights to her son, R.L., and ordering a permanent plan of adoption.  Mother contends the juvenile court abused its discretion by denying her request for a bonding study and concluding that the beneficial parent-child relationship and sibling relationship exceptions to adoption did not apply.  (Welf. & Inst. Code,[1] § 366.26, subds. (c)(1)(B)(i) & (v).)  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    Adjudication and disposition.

R.L. was born in November 2015.  His older half-sister, D.H., was born in October 2008.  Only R.L. is a subject of this appeal.

The family was referred to the Los Angeles County Department of Children and Family Services (DCFS) in 2017, 2019, and 2022.  The juvenile court sustained a petition in April 2019 alleging domestic violence between mother and R.L.'s father, Brian L. (father).  R.L. and D.H. were removed from mother's custody for several months; the children were later returned and the case was terminated.

In March 2022, mother and her boyfriend were arrested after a domestic violence incident in R.L.'s presence.  Mother said

---

[1]    Subsequent statutory references are to the Welfare and Institutions Code.

she was chronically homeless and did not have a stable residence. She did not know where father was living. R.L. had been diagnosed with moderate autism and had limited verbal ability.

DCFS filed a juvenile dependency petition in March 2022. As later amended, the petition alleged that R.L. was a juvenile court dependent because mother and her boyfriend had a history of domestic violence and were arrested for corporal injury to a spouse or partner (counts a-1, b-1, and j-1); mother had a history of substance abuse and currently abused alcohol (count b-2); father had a history of substance abuse; and father's younger child was a juvenile court dependent because of father's substance abuse (count j-2).

On March 24, 2022, the juvenile court detained R.L. from mother and father. He was placed in foster care.

The juvenile court sustained the petition in April 2022, and removed R.L. from both parents in June 2022. The court ordered mother to complete a six-month drug and alcohol program, a parenting class, and individual counseling, and it allowed her weekly monitored visitation. Father was not granted reunification services.

## II. Reunification period (June 2022–June 2023).

In June 2022, the juvenile court ordered R.L. placed with maternal grandfather Javier L. (grandfather) and Perla C., grandfather's partner of eight years (collectively, grandparents). The grandparents were also raising grandfather's ten-year-old son Javi.[2]

In December 2022, DCFS reported that mother had partially complied with her case plan and was visiting R.L.

---

[2] Grandparents were married in October 2024.

3

intermittently. The grandparents expressed concerns that mother's inconsistent visits were negatively affecting R.L., noting that he would call for mother and express sadness if she did not visit.

In June 2023, DCFS reported that R.L. was receiving regular speech therapy and his speech had improved significantly. He was using longer sentences and was communicating his needs with words, rather than by pointing. He was comfortable with his grandparents, looked to them for comfort, and loved playing with Javi, whom he referred to as his brother. Mother was visiting R.L. weekly and visits reportedly went well.

On June 2, 2023, the court found mother's progress had been insubstantial and terminated her reunification services. The court set a section 366.26 hearing for September 2023.

## III. Post-reunification proceedings.

In September 2023, grandfather reported that mother had been less consistent with visits, missing some visits in June, July, and August. R.L. was excited to see mother at the beginning of visits, sad when visits ended, and upset when mother did not show up for scheduled visits.

In November 2023, R.L.'s grandparents said they would like to adopt him. The next month, DCFS reported that R.L. was securely attached to his grandparents, who were loving and supportive of his developmental needs. He had begun using the tools he had learned in therapy and was better able to express his emotions and recognize the emotions of others. His speech remained limited, but he could speak in short sentences.

In May 2024, DCFS reported that R.L. was thriving in his grandparents' care. He had developed a secure attachment to

4

them, called them " 'Mom' " and " 'Dad,' " and looked to them for assurance and guidance.  The grandparents were supportive of his developmental needs and had linked him up with a variety of services.  R.L.'s speech had continued to improve and he was able to speak in two to four word sentences.  He no longer had emotional outbursts and he was able to interact with his peers without issue.  Mother was visiting R.L. weekly, and visits went well:  Mother was appropriate with R.L., and he was affectionate towards her.  R.L. no longer had difficulty transitioning after visits and did not appear distressed when mother missed visits.

In September 2024, DCFS noted that R.L.'s speech continued to improve, and he had begun to use five to eight word sentences.  Mother continued regular weekly visits with R.L., and he reportedly was happy to see her.  Several months later, DCFS reported that R.L. was very affectionate with his grandparents and Javi, referred to his grandparents as mom and dad, and referred to Javi as his brother.  When asked if he wanted to be adopted, R.L. said " 'yes.' "  R.L. said he was happy to be living with his grandparents because " 'I have mom, dad, brother, and toys.' "  DCFS opined:  "There is a clear attachment between [R.L. and his grandparents]."

In February 2025, DCFS reported that mother continued to visit R.L. weekly and was affectionate and appropriate with him.  However, he did not react negatively at the end of visits or if visits were canceled.

## IV.    Section 366.26 proceedings.

### A.    DCFS's evaluation of the sibling bond.

In April 2025, mother's counsel asked that DCFS interview D.H. to assess the bond between her and R.L.  The court granted the request.

The social worker spoke to D.H. in May 2025.  D.H. said she had lived with her father since 2022 and had seen R.L. infrequently.  She said she and R.L. nonetheless remained close, cared for one another, and were happy to see each other.

Mother reported that R.L. and D.H. had a strong bond because they had grown up together.  She said R.L. was always happy when he saw D.H. and was affectionate and caring towards her.

Grandfather said that D.H. and R.L. had seen each other six to eight times since 2022, and they sometimes spoke on the phone during mother's visits with R.L.  R.L. was always happy to see D.H. and affectionate with her, but he did not ask about D.H. between visits.  Grandfather said that if he adopted R.L., he would support continued contact between the siblings.

R.L. said he was not sad when he did not see D.H.  When asked how he would feel if he did not see D.H. again, he put his thumb up and said he would be okay.  When asked how he would feel if D.H. no longer played with him at the park, R.L. said, " 'I'll be okay, not sad.' "

At a June 16, 2025 hearing, mother's counsel requested that the court order a bonding study to evaluate the bond between R.L. and D.H.  The court denied the request, noting that the social worker had interviewed both R.L. and D.H. and had addressed the sibling bond in its report.  Thus, "the court does not see a necessity for an outside study."

6

### B.    August 2025 report.

In August 2025, DCFS reported that when asked about his relationship with mother, R.L. said, " '[S]he's nice, kind to me, we play hide and seek, we eat and buy toys.' "  He said he's " 'happy and okay' " when he sees mother.  He said mother, his brother Javi, Grandpa Javier, D.H., and mom Perla made him happy. When asked if he would like to live with mother, he said, " 'I want to stay here [with grandparents].' "  The social worker asked what he liked about living with his grandparents, and R.L. said he liked playing with his grandfather and Javi, and liked grandfather taking care of him when he was sick.  R.L. said he felt " 'happy' " when D.H. attended visits, but said he was " 'okay, not sad' " when he did not see her.  If he did not see D.H. again, he would " 'be okay, not sad.' "

R.L. said adoption was " 'having a new family.' "  He said he would feel " 'good' " about being adopted by his grandparents, adding " 'me want to stay here.' "  He said he had two moms and two dads, whom he identified as his parents and grandparents. When asked how he would feel if mother were no longer his mother, R.L. said, " 'I okay.' "  He said that if he were to no longer have visits with mother, he would feel " '[n]ot sad, me okay.' " And when asked how he would feel if mother were no longer his mother and D.H. were no longer his sister, he said, " 'Me okay. I'll be okay. . . .  Not sad.' "

### C.    October 2025 hearing.

At the section 366.26 hearing in October 2025, mother's counsel argued that the sibling relationship and parental bond exceptions applied.  Counsel noted that R.L. had lived with mother and D.H. until he was six years old, and mother had

visited R.L. consistently since he was placed with his grandparents.  Further, counsel argued, there was a beneficial parent-child relationship:  Mother supported R.L.'s speech and learning, assisted him with homework, disciplined him appropriately, played with him, and was affectionate during visits.  R.L. was comfortable around mother and did not throw tantrums in her presence.  Both the caregivers and social worker described a bond between mother and R.L.  Further, R.L. had had regular contact and visitation with D.H. and referred to her as his sister.  Counsel thus urged that parental rights should not be terminated and R.L. should be placed in a legal guardianship.

Minor's counsel urged the court to terminate parental rights.  Counsel agreed that mother had visited R.L. regularly and that visits went well.  However, R.L. did not have trouble leaving visits and had told the social worker that he would be " 'fine' " if parental rights were terminated.  Counsel acknowledged that mother and R.L. loved one another, but urged that the bond between them was not strong enough to outweigh the benefits to R.L. of adoption.  With regard to D.H., there had been only six to eight visits between R.L. and D.H. prior to May 2025, R.L. did not react negatively when visits ended, and he said he would be okay if he did not continue to see D.H.

The court concluded that the parental benefit exception to adoption did not apply.  It found that mother visited regularly and R.L. enjoyed those visits.  Nonetheless, terminating the parent-child relationship would not be detrimental to R.L., and any detriment was outweighed by the benefit to R.L. of adoption. The court noted that although R.L. did not give lengthy answers to questions, he had been able to answer the social worker's questions and had not expressed distress about terminating his

legal relationship with mother. Further, "[t]he home that he's in is very stable, is very positive. The current caregivers who are relatives are very supportive of the minor and care for him and want to adopt him and provide stability for him. So the court does not find that the termination of parental rights would be detrimental to the child in this case."

The court also found that the sibling bond exception did not apply. It noted that visits between R.L. and D.H. were positive, but there had only been six to eight visits between March 2022 and July 2025. Further, R.L. said he would be "okay" and "not sad" if he did not see D.H. in the future. Thus, the court found that any detriment to R.L. caused by terminating the sibling bond was outweighed by the benefit to him of adoption.

Based on the foregoing, the court found no exception to adoption applied and terminated parental rights. Mother timely appealed from the termination order.

## DISCUSSION

### I.    Denial of mother's request for a bonding study.

Mother contends the trial court erred by denying her June 16, 2025 request for a bonding study examining the sibling bond between R.L. and D.H. The issue is not properly before us in this appeal.

Pursuant to section 395, "[a] judgment in a proceeding under Section 300 may be appealed in the same manner as any final judgment, and any subsequent order may be appealed as an order after judgment." (§ 395, subd. (a)(1).) The " 'judgment' " in a dependency case is the dispositional order, and thus all subsequent orders are appealable. (*In re S.B.* (2009) 46 Cal.4th 529, 532.) A consequence of section 395 " ' "is that an unappealed

9

disposition or postdisposition order is final and binding and may not be attacked on an appeal from a later appealable order." ' " (*Ibid*.) A notice of appeal from a dependency order "must be filed within 60 days after the rendition of the judgment or the making of the order being appealed." (Cal. Rules of Court, rule 8.406(a)(1).)

The juvenile court entered a disposition order in June 2022. The court's June 2025 denial of mother's request for a bonding study therefore was appealable as an order after judgment. (See § 395, subd. (a)(1).) However, mother did not file a notice of appeal within 60 days of the issuance of that order—that is, by September 15, 2025. The order therefore may not be challenged in this appeal from the subsequent order terminating parental rights.

Mother asks this court to consider her challenge to the July 16 order because it "directly affect[ed]" the subsequent order terminating parental rights. The only authority mother cites for this proposition is *In re Matthew C.* (1993) 6 Cal.4th 386, 388, superseded by statute as stated in *People v. Mena* (2012) 54 Cal.4th 146, 156–157, in which the Supreme Court held that a juvenile court's order terminating a parent's reunification services was reviewable in an appeal from a subsequent order terminating parental rights. But the Legislature abrogated *Matthew C.* by enacting section 366.26, subdivision (l)(1)(C), which provides that an order terminating reunification services may not be reviewed on appeal unless a timely writ petition has been filed. (See *Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, 1160, fn. 1.) *Matthew C.* thus is not authority for the proposition that the trial court's order denying mother's request for a bonding study is reviewable in this appeal.

10

## II. Beneficial parent-child relationship exception.

Mother contends the juvenile court erred by concluding that the beneficial parent-child relationship exception to adoption did not apply. As we discuss, this contention lacks merit.

### A. Legal standards.

If the court cannot safely return a dependent child to a parent's custody within statutory time limits, the court must set a hearing under section 366.26 to select a permanent plan for the child. (*In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).) The statute lists plans in order of preference and provides a detailed procedure for choosing among them. (See § 366.26, subd. (b).) If the court finds by clear and convincing evidence that the child is likely to be adopted and there has been a previous determination that reunification services be terminated, then the court "shall terminate parental rights to allow for adoption." (*Caden C.*, at p. 630.)

Section 366.26, subdivision (c)(1)(B)(i) provides an exception where terminating parental rights would be detrimental to the child because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." Our Supreme Court has explained that to establish the parental-benefit exception, a parent must prove three elements by a preponderance of the evidence—"(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 631.) If the parent meets their burden, "the parental-benefit exception applies such that it would not be in the best interest of the child

11

to terminate parental rights, and the court should select a permanent plan other than adoption." (*Id.* at pp. 636–637.)

Because terminating parental rights eliminates any legal basis for a parent-child relationship, courts "must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) "In each case, then, the court acts in the child's best interest in a specific way: it decides whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' " (*Ibid.*)

The first two elements of the parental-benefit exception—whether the parent has visited the child consistently and the child would benefit from continuing the relationship with the parent—are factual determinations that we review for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at p. 639.) Because the parent bears the burden of establishing these elements, the juvenile court's findings may be reversed only if evidence compels a finding in favor of the parent on these issues as a matter of law (*In re Breanna S.* (2017) 8 Cal.App.5th 636, 647, disapproved of on other grounds in *Caden C.*, at p. 637, fn. 6), or the court applied the wrong legal standard and the evidence would support a finding for the parent (*In re J.D.* (2021) 70 Cal.App.5th 833, 865; *In re J.R.* (2022) 82 Cal.App.5th 526, 533). The third element—whether termination of parental rights would be detrimental to the child—is reviewed for abuse of discretion. (*Caden C.*, at p. 640.)

## B.     Analysis.

We assume without deciding that mother established the first two elements of the *Caden C.* analysis—that is, that mother visited R.L. regularly and that the relationship with mother benefited him.  We therefore consider whether the juvenile court abused its discretion by concluding that the benefit to R.L. of adoption outweighed the harm of severing his relationship with mother.

We find no abuse of discretion.  R.L. was removed from mother's custody when he was just six years old.  By the time parental rights were terminated in October 2025, he had been out of mother's care for more than three-and-a-half years, or more than a third of his life.  He was thriving under his grandparents' care and had developed a healthy attachment to them.  He was also bonded to their son, with whom he shared a room and whom he referred to as his brother.  His grandparents had obtained a variety of services to meet R.L.'s special needs; as a result, his speech had improved significantly, his emotional outbursts had ceased, and he was able to interact with his peers without issue.

Although R.L. enjoyed visits with mother, there was no evidence that he had an emotionally significant relationship with her.  When he was first removed from mother in 2022, he would ask for her and express sadness if she did not visit.  However, since at least early 2024, DCFS consistently reported that R.L. had no difficulty ending visits with mother and did not appear distressed when mother missed visits.  When asked how he would feel if he no longer had visits with mother, R.L. said he would be " 'okay' " and would not be sad.  He said he felt " 'good' " about being adopted by his grandparents and wanted to continue living with them.  And, when asked if he would want to live with

13

mother in the future, R.L. said he " 'wanted to stay here [with his grandparents].' "

Mother contends that R.L.'s statements about adoption and his relationship with mother were not reliable because as an autistic child, he may have a condition called "echolalia" which involves continuously repeating words he has heard. Alternatively, mother contends, R.L. may repeat a familial, predictable phrase like "I'm okay" " 'as a form of verbal stimming to help the child self-sooth during anxiety.' "[3] Mother further asserts that R.L. "likely felt a stress and pressure because of the social worker's questions and so he began to default into an echolalic response, e.g., 'I am okay.' " But there is no evidence that R.L. experienced echolalia, found the social worker's questions stressful, or repeated familiar phrases to self-sooth. Merely because *some* children with autism use language in this way does not establish that R.L. does so. In any event, mother did not raise this issue below, therefore forfeiting it. (E.g., *In re N.R.* (2017) 15 Cal.App.5th 590, 598 [where an argument "involves an issue of fact rather than a pure question of law," it is "forfeited by appellant's failure to raise it below"]; *Blankenship v. Allstate Ins. Co.* (2010) 186 Cal.App.4th 87, 105 ["We do not consider factual arguments raised for the first time on appeal"].)

Mother also suggests that the trial court should have ordered a legal guardianship, rather than adoption, because

---

[3] Mother suggests that R.L. is functionally nonverbal. But the reports mother cites for this proposition are from 2022, when R.L. was just six years old. By the time parental rights were terminated in October 2025, R.L. was almost ten years old, had received years of speech therapy, and was speaking in five to eight word sentences.

14

guardianship would have allowed R.L. to remain in his grandparents' home while maintaining a legal relationship with mother.  We do not agree.  " ' "If [a] dependent child is adoptable, there is a strong preference for adoption over the alternative permanency plans."  [Citation.]'  (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1224.)"  (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 316.) " ' "[C]hildren can be afforded the best possible opportunity to get on with the task of growing up by placing them in the most permanent and secure alternative that can be afforded them." [Citation.]  Guardianship, since it is not irrevocable, " 'falls short of the secure and permanent placement intended by the Legislature.' " ' " (*Guardianship of C.E.* (2019) 31 Cal.App.5th 1038, 1057.)  This is particularly true in cases concerning very young children, "whose needs for a competent, caring and stable parent are paramount."  (*In re Valerie A.* (2007) 152 Cal.App.4th 987, 1014.)  Here, R.L. was just nine years old and had significant special needs.  Thus the benefits to him of adoption over legal guardianship were exceptionally strong.  The trial court did not err by so concluding.

## III.   Sibling relationship exception.

Section 366.26, subdivision (c)(1)(B)(v) provides an exception to adoption where terminating parental rights would be detrimental to the child because "[t]here would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best

15

interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption."

"Reflecting the Legislature's preference for adoption when possible, the 'sibling relationship exception contains strong language creating a heavy burden for the party opposing adoption.  It only applies when the juvenile court determines that there is a "compelling reason" for concluding that the termination of parental rights would be "detrimental" to the child due to "substantial interference" with a sibling relationship.'  [Citation.]  Indeed, even if adoption would interfere with a strong sibling relationship, the court must nevertheless weigh the benefit to the child of continuing the sibling relationship against the benefit the child would receive by gaining a permanent home through adoption."  (*In re Celine R.* (2003) 31 Cal.4th 45, 61.)

Parents have the burden of establishing the applicability of the sibling relationship exception.  (*In re J.S.* (2017) 10 Cal.App.5th 1071, 1080.)  We apply the substantial evidence standard of review to the court's factual findings regarding the applicability of the sibling relationship exception, and the abuse of discretion standard to the court's weighing of competing interests.  (*Ibid.*; *In re Isaiah S.* (2016) 5 Cal.App.5th 428, 438.)

The juvenile court did not abuse its discretion by concluding that the strength of the sibling relationship did not outweigh the benefits to R.L. of adoption.  D.H. is seven years older than R.L., and although they lived together for the first six years[4] of R.L.'s life, they had lived apart for more than three

---

[4]     Mother suggests that R.L. and D.H. lived together for eight years.  In fact, R.L. was removed from mother's custody in early

16

years by the time of the section 366.26 hearing. The children appeared to care for one another, but their visits were sporadic— just six to eight visits between March 2022 and May 2025. R.L. had no difficulty separating from D.H., did not ask for her between visits, and said he would be " 'okay' " if he did not see her again. In any event, R.L.'s and D.H.'s relationship was likely to continue: R.L.'s adoptive parents were also D.H.'s grandparents, and maternal grandfather said that if he adopted R.L., he would support continued contact between the siblings.

Application of the sibling relationship exception is "rare, particularly when the proceedings concern young children whose needs for a competent, caring and stable parent are paramount." (*In re Valerie A.*, *supra*, 152 Cal.App.4th at p. 1014; see also *In re D.O.* (2016) 247 Cal.App.4th 166, 174 ["we reiterate the rarity

---

2022, when he was six years old, and the children never again lived together.

Mother also suggests that R.L. and D.H. "chased each other around the furniture, they played hide-and-seek, they celebrated each other's birthdays and other holidays, they watched cartoons, they ate meals together, and [D.H.] helped her brother; [R.L.] relied on his big sister for her help since he suffered from Autism." Mother does not cite to the record to support these contentions, but instead suggests that "in the United States there are general experiences in life which occur between siblings." We reject mother's argument because it is based entirely on a factual allegation for which there is no support in the record. "Appellate review is generally limited to matters contained in the record. Factual matters that are not part of the appellate record will not be considered on appeal and such matters should not be referred to in the briefs." (*Lona v. Citibank, N.A.* (2011) 202 Cal.App.4th 89, 102; see also Cal. Rules of Court, rule 8.204(a)(2)(C) [facts discussed in appellate briefs should be limited to "matters in the record"].)

17

with which the sibling relationship exception applies"].)  In this case, R.L. was young, had significant special needs, and was thriving in the home of grandparents who wished to adopt him. The juvenile court did not abuse its discretion by concluding that the benefits to R.L. of adoption far exceeded the benefits to him of maintaining a legal relationship with D.H.

## DISPOSITION

The October 16, 2025 order terminating parental rights is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ASHWORTH, J.*


We concur:


ADAMS, Acting P. J.                    HANASONO, J.

---

\* Retired Judge of the El Dorado County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.